UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 3, 2018

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal No. |
| | ) <u>UNDER SEAL</u> |
| | ) |
| v. | ) Grand Jury Original |
| | ) |
| NAEEM RIAZ TYAB, | ) 18 U.S.C. § 371 (Conspiracy) |
| MAHAMOUD ADAM BECHIR, | ) 18 U.S.C. § 1956(h) (Money |
| YOUSSOUF HAMID TAKANE, | ) Laundering Conspiracy) |
| and | ) 18 U.S.C. § 1956(a)(1)(B)(i) |
| NOURACHAM BECHIR NIAM, | ) (Concealment Money Laundering) |
| | ) 18 U.S.C. § 2 (Aiding and Abetting) |
| Defendants. | ) 18 U.S.C. § 981(a)(1)(C) (Civil |
| | ) Forfeiture) |
| | ) 18 U.S.C. § 982(a)(1) (Criminal |
| | ) Forfeiture) |
| | ) |

**INDICTMENT**

The Grand Jury charges that:

At all times relevant to this Indictment, unless otherwise specified:

**The Foreign Corrupt Practices Act**

1. The "anti-bribery" provision of the Foreign Corrupt Practices Act of 1977 ("FCPA"), among other things, forbids payments or offers to pay foreign officials to corruptly influence them to secure an improper advantage in order to assist with obtaining or retaining business or to direct business to any person. 15 U.S.C. §§ 78dd-1, *et seq*. It also prohibits payments or offers to pay a third-party, while knowing that any portion of the payment or thing of value will be offered, given or promised, directly or indirectly, to a foreign official with the corrupt intent to secure an improper advantage in order to obtain or retain business or to direct

1

business to any person. Id.

### The Defendants and Other Relevant Individuals and Entities

2.  Defendant **NAEEM RIAZ TYAB** ("**TYAB**") was a citizen of Canada. **TYAB** was a founding shareholder of a Canadian start-up energy company ("Energy Company") and served as a director of Energy Company from in or around August 2009 to in or around July 2011. **TYAB** and Energy Company were each a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

3.  Defendant **MAHAMOUD ADAM BECHIR** ("**BECHIR**") was the Republic of Chad's ("Chad") Ambassador to the United States and Canada who served at the Embassy of Chad located in the District of Columbia from in or around 2004 to in or around 2012. **BECHIR** was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

4.  Defendant **YOUSSOUF HAMID TAKANE** ("**TAKANE**") was Chad's Deputy Chief of Mission for the United States and Canada who served at the Embassy of Chad located in the District of Columbia from in or around 2007 to in or around 2012. **TAKANE** was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

5.  Defendant **NOURACHAM BECHIR NIAM** ("**NIAM**") was the wife of **BECHIR** and resided with him in the District of Columbia between approximately 2009 and 2011. **NIAM** was a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

6.  Co-Conspirator 1 was a Canadian citizen and resident and a founding shareholder in Energy Company. Co-Conspirator 1 died in or around July 2011. Co-Conspirator 1 was a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

2

7. Co-Conspirator 2 was a Canadian citizen and resident and a founding shareholder in Energy Company. Co-Conspirator 2 was a close relative of **TYAB**. Co-Conspirator 2 was a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

8. Co-Conspirator 3 was a Canadian citizen and resident and a close relative of **TAKANE**. Co-Conspirator 3 was a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

9. Ambassade du Tchad, LLC ("Ambassade du Tchad") was a company formed in the State of Maryland in or around October 2007 that was owned and controlled by **BECHIR**. Despite its name, Ambassade du Tchad was not affiliated with the government of Chad.

10. Chad Oil Consultants, LLC, also known as Chad Oil Consulting LLC, ("COCL"), was a company that was formed in the State of Nevada in or around September 2009, and also registered in the State of Maryland in or around March 2011. COCL was purportedly owned and controlled by **NIAM**.

11. "Bank Account 1" was a bank account located in the District of Columbia in the name of COCL, over which **NIAM** had sole signature authority. Bank Account 1 was opened by **NIAM** on or about October 28, 2009 in the District of Columbia.

**COUNT ONE**
**Conspiracy to Violate the FCPA**
**(TYAB and NIAM)**

12. The allegations set forth in Paragraphs 1 through 11 are re-alleged and incorporated by reference as if fully set forth herein.

13. From in or around August 2009 until in or around July 2014, in the District of Columbia, and elsewhere, the defendants,

**NAEEM RIAZ TYAB** and
**NOURACHAM BECHIR NIAM,**

3

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly, combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit an offense against the United States, that is: while in the territory of the United States, to willfully and corruptly make use of the mails and a means and instrumentality of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in the official's official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use the official's influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **TYAB**, Energy Company, Co-Conspirator 1, Co-Conspirator 2, and others in obtaining and retaining business for and with, and directing business to, **TYAB**, Energy Company, Co-Conspirator 1, Co-Conspirator 2, and others, in violation of Title 15, United States Code, Section 78dd-3.

## Purpose

14.     It was the purpose of the conspiracy for **TYAB** and **NIAM** and their co-conspirators to unlawfully enrich themselves by making corrupt payments to Chadian officials, including **BECHIR** and **TAKANE**, in order to obtain lucrative oil contracts for Energy Company from the government of Chad, thereby increasing the value of their respective holdings and property interests in Energy Company.

## Manner and Means

15. The manner and means by which **TYAB** and **NIAM** and their co-conspirators sought to accomplish the purposes of the conspiracy included, among other things, the following:

16. The co-conspirators discussed in person, via email, and via telephone their plan and agreement to pay bribes to Chadian officials to obtain lucrative oil contracts and rights from Chad.

17. The co-conspirators discussed in person, via email, and via telephone the method by which they would pay bribes to Chadian officials to secure contracts from Chad, including via wire transfer.

18. The co-conspirators attempted to disguise bribes to Chadian officials as legitimate business transactions by using sham consulting agreements and transmitting payments to shell companies.

19. The co-conspirators further attempted to disguise bribes to Chadian officials as legitimate business transactions by transferring Energy Company shares to **BECHIR** and **TAKANE** indirectly, through **NIAM**, Co-Conspirator 3, and a third Chadian associate.

20. The co-conspirators used instrumentalities of interstate commerce to execute their bribery scheme, including making illicit payments through wire transfers and money orders and establishing a United States bank account to which to direct certain payments.

## Overt Acts

21. In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the District of Columbia, and elsewhere, at least one of the following overt acts, among others:

22. In or around 2008, **TYAB** and his co-conspirators, including Co-Conspirator 1, contacted **BECHIR** and **TAKANE** concerning opportunities for Energy Company to obtain lucrative oil exploration and development rights in Chad.

23. On or about March 22, 2009, **TYAB** forwarded to Co-Conspirator 1, Co-Conspirator 2, and others an email from **TAKANE** to **TYAB** affirming **BECHIR's** willingness to "use his influence" to help Energy Company secure an oil contract in Chad and advising **TYAB** to include "explicit financial incentives" to "influence the key decision-makers."

24. In or around early to mid-2009, **TYAB**, **BECHIR**, and **NIAM** met in the District of Columbia to discuss the creation of a consulting contract through which Energy Company would pay $2 million and issue founders' shares in Energy Company to **NIAM** and others upon the award of certain oil rights in Chad to Energy Company.

25. On or about July 28, 2009, **TYAB** met with **BECHIR** for several hours in the District of Columbia shortly before executing a consulting contract with **BECHIR's** company.

26. On or about August 1, 2009, **TYAB**, Co-Conspirator 1, and Co-Conspirator 2 caused Energy Company's counsel to draft a consulting contract with the name of the consultant left blank.

27. On or about August 30, 2009, **TYAB**, on behalf of Energy Company, and **BECHIR**, on behalf of Ambassade du Tchad, executed a consulting agreement whereby Energy Company agreed to pay Ambassade du Tchad $2 million upon being awarded certain oil rights in Chad.

28. In or around September 2009, **TYAB**, Co-Conspirator 1, and Co-Conspirator 2 caused the revocation of Energy Company's consulting contract with Ambassade du Tchad after

6

they received legal advice against entering into a consulting agreement with a foreign government official.

29. On or about September 10, 2009, COCL was created and **BECHIR's** wife, **NIAM** was listed as its nominal owner.

30. On or about September 15, 2009, **TYAB**, on behalf of Energy Company, and **NIAM**, on behalf of COCL, executed a consulting contract, under which Energy Company agreed to pay $2 million to COCL upon being awarded certain oil rights in Chad. The COCL consulting contract was substantially similar to the revoked August 30, 2009, consulting contract between Energy Company and **BECHIR's** company, Ambassade du Tchad, except that COCL was named as the consultant rather than Ambassade du Tchad.

31. On or about September 15, 2009, **NIAM**, Co-Conspirator 3, and **BECHIR** (on behalf of and in the name of a third Chadian individual) completed U.S. Accredited Investor Certificates in the District of Columbia so that they could qualify to obtain founders' shares in Energy Company.

32. On or about September 19, 2009, **NIAM** caused two money orders from Western Union in the District of Columbia, one in the amount of $1,000.00 and another in the amount of $488, to be sent from the United States to Energy Company in Canada as payment for founders' shares in Energy Company.

33. On or about September 19, 2009, Co-Conspirator 3 caused a money order from Western Union in the amount of $745 to be sent from the United States to Energy Company in Canada as payment for founders' shares in Energy Company.

34. On or about September 24, 2009, **TYAB** and Co-Conspirator 1 met with **BECHIR** and other high-level Chadian government officials at the Ritz-Carlton Hotel in the District of Columbia regarding Energy Company's efforts to secure oil rights in Chad.

35. On or about October 1, 2009, **TYAB**, Co-Conspirator 1, and Co-Conspirator 2 signed an Energy Company resolution issuing shares to nine individuals or entities, including **NIAM**, Co-Conspirator 3, and a third Chadian individual.

36. On or about October 26, 2009, **TYAB,** on behalf of Energy Company, entered into a Memorandum of Understanding with the Ministry of Petroleum and Energy of Chad to begin negotiations regarding the development of certain Chadian oil blocks.

37. On or about October 28, 2009, **NIAM** opened Bank Account 1 in the District of Columbia.

38. On or about December 18, 2010, **TYAB** forwarded to another Energy Company executive an email from **TAKANE**, in which **TAKANE** forwarded to **TYAB** and Co-Conspirator 1 an email from **BECHIR** that stated, "We need to sign a new service agreement to facilitate the negotiations, higher than the existing agreement of ($2M)."

39. In or around January 2011, at about the same time that Energy Company's wholly-owned subsidiary entered into a production sharing contract for oil rights with Chad, and after the prior agreement with COCL had expired, **TYAB** and **NIAM** executed a second contract between Energy Company and COCL for the payment of $2 million from Energy Company to COCL upon the Chad government granting Energy Company the rights to the Chadian oil blocks that were the subject of the production sharing contract.

40. On or about February 8, 2011, **TYAB** forwarded to Co-Conspirator 2 an email from **TAKANE** with account information for the payment of $2 million to Bank Account 1, which **TAKANE** stated was an account in the name of COCL held by **NIAM**.

41. On or about February 9, 2011, **TAKANE** went to a District of Columbia branch of a bank in which he held an account to inform the bank that he was expecting an incoming wire of $300,000 from the embassy and that the embassy was paying him bonuses.

42. On or about February 10, 2011, after having little to no activity in the bank account referenced in Paragraph 41 from on or about October 15, 2009 until on or about February 9, 2011, and a balance of $3.48, **TAKANE** deposited $100 cash into the account at a District of Columbia bank branch.

43. On or about February 10, 2011, **TYAB**, **NIAM**, and their co-conspirators caused a wire transfer in the amount of approximately $1,999,990 to be sent from an escrow account in Canada to Bank Account 1 in the District of Columbia.

44. On or about February 15, 2011, **NIAM** and **BECHIR** caused the wire transfer of approximately $70,000 from Bank Account 1 to an account controlled by **BECHIR** in Maryland.

45. On or about February 15, 2011, **NIAM** and **BECHIR** caused the wire transfer of approximately $30,000 from Bank Account 1 to an account controlled by **BECHIR** in Maryland.

46. On or about February 15, 2011, **NIAM** and **TAKANE** caused the attempted wire transfer of approximately $300,000 from Bank Account 1 in the District of Columbia to **TAKANE's** bank account referenced in Paragraphs 41-42.

47. On or about February 17, 2011, **NIAM** and **BECHIR** caused the wire transfer of approximately $250,000 from Bank Account 1 to a bank account in Virginia that was in the name of a company beneficially owned and controlled by **BECHIR** and **NIAM**.

48. On or about February 17, 2011, **NIAM** and **TAKANE** caused the wire transfer of approximately $10,000 from Bank Account 1 in the District of Columbia to a bank account held and controlled by **TAKANE**.

49. On or about February 18, 2011, **NIAM** purchased a cashier's check at a District of Columbia bank branch using funds from Bank Account 1 in the amount of approximately $1,502,045.

50. On or about February 22, 2011, **NIAM** and **BECHIR** caused the transfer of approximately $1,502,045 from Bank Account 1 to a Virginia account in the name of COCL.

51. On or about April 24, 2014, **TYAB** caused a wire transfer in the amount of approximately $808,027 to be sent from a Canadian brokerage account as proceeds of a sale of Energy Company shares to a bank account **TYAB** beneficially owned.

52. On or about April 25, 2014, **TYAB** caused a wire transfer in the amount of approximately $893,207 to be sent from a Canadian brokerage account as proceeds of a sale of Energy Company shares to a bank account **TYAB** beneficially owned.

53. On or about May 2, 2014, **TYAB** caused a wire transfer in the amount of approximately $399,980 to be sent from a Canadian brokerage account as proceeds of a sale of Energy Company shares to a bank account **TYAB** beneficially owned.

54. On or about May 8, 2014, **TYAB** caused a wire transfer in the amount of approximately $39,980 to be sent from a Canadian brokerage account as proceeds of a sale of Energy Company shares to a bank account **TYAB** beneficially owned.

55. In or around June 2014, **NIAM** caused her 3,200,000 Energy Company shares to be tendered back to the stock transfer company in connection with an acquisition of Energy

Company, at which point the shares were valued at approximately £5.50 per share, a profit of approximately $30 million.

56. In or around June 2014, Co-Conspirator 3 caused Co-Conspirator 3's 800,000 Energy Company shares to be tendered back to the stock transfer company in connection with an acquisition of Energy Company, at which point the shares were valued at approximately £5.50 per share, a profit of approximately $7.5 million.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### Conspiracy to Commit Money Laundering
### (TYAB, NIAM, BECHIR and TAKANE)

57. The allegations set forth in Paragraphs 1 through 11 and Paragraphs 21 through 56 are re-alleged and incorporated by reference as if fully set forth herein.

58. From in or around August 2009, through in or around April 2011, in the District of Columbia and elsewhere, the defendants,

**NAEEM RIAZ TYAB,
NOURACHAM BECHIR NIAM,
MAHAMOUD ADAM BECHIR, and
YOUSSOUF HAMID TAKANE**

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit an offense against the United States, that is:

a. to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, namely, the bribery of **MAHAMOUD ADAM BECHIR** and **YOUSSOUF HAMID TAKANE** by **TYAB**, Energy Company, and others, in violation of Title 15, United States Code, Section 78dd-3, the Canadian Corruption of Foreign Public Officials Act, and Chadian law prohibiting bribery of a public official, knowing that the property involved in the financial transaction

11

represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

    b. to transport, transmit and transfer a monetary instrument and funds to a place in the United States from and through a place outside the United States, and from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, namely, the bribery of **MAHAMOUD ADAM BECHIR** and **YOUSSOUF HAMID TAKANE** by **TYAB**, Energy Company, and others, in violation of Title 15, United States Code, Section 78dd-3, the Canadian Corruption of Foreign Public Officials Act, and Chadian law prohibiting bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

  All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 3-4
### Concealment Money Laundering
### (NIAM and BECHIR)

59. The allegations set forth in Paragraphs 1 through 11 and Paragraphs 21 through 56 are re-alleged and incorporated by reference as if fully set forth herein.

60. On or about the dates below, in the District of Columbia and elsewhere, the defendants,

**NOURACHAM BECHIR NIAM** and
**MAHAMOUD ADAM BECHIR**

knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, which transaction and attempted transaction involved the proceeds of specified

unlawful activity, knowing that the property involved in the financial transaction and attempted transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 15, United States Code, Section 78dd-3, and in violation of the Canadian Corruption of Foreign Public Officials Act, and Chadian law prohibiting bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) as follows:

| COUNT | APPROX. DATE OF TRANSACTION | FINANCIAL TRANSACTION |
|---|---|---|
| 3 | February 17, 2011 | **NOURACHAM BECHIR NIAM** and **MAHAMOUD ADAM BECHIR** caused and aided and abetted the wire transfer of approximately $250,000 from Bank Account 1 to a bank account in Virginia that was in the name of a company beneficially owned and controlled by **BECHIR** and **NIAM**. |
| 4 | February 18-22, 2011 | **NOURACHAM BECHIR NIAM** and **MAHAMOUD ADAM BECHIR** caused and aided and abetted the transfer of approximately $1,502,045 from Bank Account 1 to a Virginia account in the name of COCL. |

All in violation of Title 18, United States Code §§ 1956(a)(1)(B)(i) and 2.

## COUNT 5
### Concealment Money Laundering
### (NIAM and TAKANE)

61. The allegations set forth in Paragraphs 1 through 11 and Paragraphs 21 through 56 are re-alleged and incorporated by reference as if fully set forth herein.

62. On or about the dates below, in the District of Columbia and elsewhere, the defendants,

**NOURACHAM BECHIR NIAM** and
**YOUSSOUF HAMID TAKANE**

knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, which transaction and attempted transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction and attempted transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 15, United States Code, Section 78dd-3, and in violation of the Canadian Corruption of Foreign Public Officials Act, and Chadian law prohibiting bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) as follows:

| COUNT | APPROX. DATE OF TRANSACTION | FINANCIAL TRANSACTION |
|---|---|---|
| 5 | February 17, 2011 | **NOURACHAM BECHIR NIAM** and **YOUSSOUF HAMID TAKANE** caused and aided and abetted the wire transfer of approximately $10,000 from Bank Account 1 in the District of Columbia to **TAKANE's** account in Maryland. |

All in violation of Title 18, United States Code §§ 1956(a)(1)(B)(i) and 2.

## FORFEITURE
### (TYAB, BECHIR, NIAM and TAKANE)

63.     The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **NAEEM RIAZ TYAB, MAHAMOUD ADAM BECHIR, NOURACHAM BECHIR NIAM,** and **YOUSSOUF HAMID TAKANE** have an interest.

64.     Upon conviction of a conspiracy to violate Title 15, United States Code, Section

78dd-3 in violation of Title 18, United States Code, Section 371, as alleged in this Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C), which is made criminally applicable by Title 28, United States Code, Section 2461(c).

65. Upon conviction of a violation of Title 18, United States Code, Section 1956, as alleged in this Indictment, the defendants shall forfeit to the United States any property, real or personal, that is involved in such offense, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

66. If any property subject to forfeiture, as a result of any act or omission of the defendants,

    a. cannot be located upon the exercise of due diligence,

    b. has been transferred or sold to, or deposited with, a third party,

    c. has been placed beyond the jurisdiction of the Court,

    d. has been substantially diminished in value, or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

67. Property subject to forfeiture, either as traceable to criminal proceeds or as substitute assets includes, but is not limited to, real property located at:

    a. **1502 35th Ave S, Seattle, WA 98144;**

    b.    **2214 E. Highland Dr., Seattle, WA 98112;**

    c.    **217 W 20th St., New York, NY 10011;**

    d.    **1677 N Crescent Heights Blvd., Los Angeles, CA 90069;**

    e.    **1000 Biscayne Blvd, One Thousand Museum, Unit 2601, Miami, FL 33132;**

    f.    **4 Chesterfield St., Mayfair, London UK W1J 5JF; and**

    g.    **16 Rue Ampere, Paris FR 75017.**

All pursuant to Title 18, United States Code, Section 982(a)(1) and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

                        A TRUE BILL.

                        FOREPERSON

_____
JESSIE K. LIU
UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA

_____
ROBERT A. ZINK
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
DEBORAH L. CONNOR
CHIEF
CRIMINAL DIVISION, MONEY LAUNDERING
& ASSET RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE